In re **MICHIGAN INTERSTATE RAILWAY COMPANY, INC. d/b/a Ann Arbor Railroad System, Debtor.**

**Bankruptcy No. 84–01043–R.**

United States Bankruptcy Court,
E.D. Michigan.

June 17, 1988.

**922**

Patrick Hackett, Bloomfield Hills, Mich., for movant.

Daniel Gosch, Detroit, Mich., for respondent.

## MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

### I. *Introduction*

The law firm of Frasco, Hackett & Mills has filed a claim in the amount of $92,-269.20, for legal fees and expenses. Attorney Patrick E. Hackett filed an additional claim in the amount of $3,279.00, for arbitration fees and expenses. Both claimants seek an equitable priority pursuant to 11 U.S.C. § 1171(b).[1] The trustee has filed objections to claimants' requests for priori-

ty treatment; the trustee does not object to the amounts of the claims.

The claimants contend that because the following three criteria are met, their claims are entitled to priority:

(1) The claim represents a current operating expense, necessarily incurred.

(2) The claim was incurred within six months before the reorganization petition was filed.

(3) The services were delivered in the expectation that they would be paid for out of current operating revenues of the railroad, and not in reliance on the railroad's general credit.

In support of their assertion that these are the only criteria that they are required to fulfill in order for their claims to be given priority, the claimants cite *Miltenberger v. Logansport C. & S.W. Ry. Co.*, 106 U.S. (16 Otto) 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882); and *In re Boston and Maine Corp.*, 634 F.2d 1359 (1st Cir.1980), *cert. denied*, 450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817 (1981).

The trustee agrees that these claims were incurred within the six months before the petition was filed. However, the trustee denies that the services resulting in the claims were current operating expenses, necessarily incurred. The trustee also denies that the services were delivered with the expectation that they would be paid for out of current operating revenues.

The trustee further contends that the claimants are required to establish one of two additional elements. If the claimants are seeking relief under the Six Months Rule, then they are required to establish the diversion of a fund of money to secured creditors, from which they might otherwise have been paid. In support, the trustee cites *Fosdick v. Schall*, 99 U.S. (9 Otto) 235, 25 L.Ed. 339 (1879); *In re New York, New Haven and Hartford Railroad Co.*, 278 F.Supp. 592 (D.Conn.1967), *aff'd*, 405 F.2d 50 (2d Cir.1968), *cert. denied*, 394 U.S.

---

1. 11 U.S.C. § 1171(b) provides:

   Any unsecured claim against the debtor that would have been entitled to priority if a receiver in equity of the property of the debtor

   had been appointed by a Federal court on the date of the order for relief under this title shall be entitled to the same priority in the case under this chapter.

999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969); *In the Matter of Penn Central Transp. Co.*, 458 F.Supp. 1234 (E.D.Pa.1978), *aff'd*, 596 F.2d 1154 (3d Cir.1979); *In re Penn Central Transp. Co.*, 467 F.2d 100 (3d Cir. 1972). Alternatively, if the claimants are seeking relief under the Necessity of Payment Rule, then they are required to establish that payment of these claims is necessary to maintain the railroad's business. In support, the trustee cites *Miltenberger*, above; and *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905). The parties appear to agree that if claimants are required to establish either of these elements, they are unable to do so.

Therefore, the three issues before the Court are:

(1) Did the services that resulted in these claims constitute current operating expenses, necessarily incurred?

(2) Did the claimants expect payment for these services out of current operating revenues?

(3) Are the claims required to establish either a diverted fund or necessity of payment?

## II. *The Necessary Current Operating Expense Element*

■ In support of their contention that the legal and arbitration services represented in the claims at issue were necessary current operating expenses, the claimants submitted an affidavit from Patrick E. Hackett. This affidavit states:

3. The claim of Frasco, Hackett & Mills (No. 41) in the amount of $92,-269.20, is for legal services performed and expenses incurred on behalf of Debtor, MIR, for defense of railroad crossing accident claims and suits, employee injury claims and suits, other personal injury claims and suits, collections, union contract disputes, and litigation with the State of Michigan to enforce contracts respecting continued rail operations by MIR, and payment therefor by the State.

4. The claim of Patrick E. Hackett (No. 105), in the amount of $3,279.00, is for arbitrator's services and related expenses incurred on behalf of Debtor, MIR, for arbitration involving contracts with the State of Michigan for continued operation of the railroad by MIR, and various disputed payments thereunder.

The claimants also note that after the reorganization petition was filed, bills for identical and similar services have been paid as administrative services. This observation is supported in paragraphs 7 and 8 of the Hackett affidavit.

The trustee argues that the legal and arbitration services were not indispensable to the continued operation of the railroad, in the same way as fuel expenses, *Burnham v. Bowen*, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596 (1884), or repair expenses, *Johnson Fare Box Co. v. Doyle*, 250 F.2d 656 (2d Cir.1958), *cert. denied*, 357 U.S. 938, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). *See also Miltenberger v. Logansport C. & S.W. Ry. Co.*, above. The trustee's argument is not supported by an affidavit.

The Court concludes that the Hackett affidavit does establish that the legal and arbitration services were necessary to keep the railroad running. A fair portion of the legal services, and all of the arbitration services, were delivered in connection with the resolution of the railroad's dispute with the Michigan Department of Transportation over continued subsidy payments and other contractual obligations. It must be concluded that if these claimants had not performed those services, the subsidy payments would have ceased, to the great detriment of the railroad.

The other legal services were delivered in connection with other litigation, such as personal injury suits, collection actions, union contract disputes, and employee claims. The Court must likewise conclude that these services were also necessary to the continued operation of the railroad. In the current era, legal services are as indispensable to the operation of a railroad as fuel supplies and repair services. The importance of legal services, especially in a failing business[2], is amply demonstrated in

2. The trustee argues that these legal services were not necessary in that if they had not been

the bankruptcy priority given to post-petition expenses for legal services pursuant to 11 U.S.C. §§ 507(a)(1), 503(b)(3) and (4), and 330(a).

Accordingly, the Court concludes that the claimants have established that the services resulting in their claims were necessary to the continued operation of the railroad.

### III. *The Claimants' Expectation As to the Source of Payment*

■ The claimants assert that when they delivered the services at issue, they expected payment from current operating revenues. This assertion is again supported in the Hackett affidavit:

9. Claimants provided the above-mentioned legal services in the expectation that they would be paid for out of the current operating revenue of MIR, and not in reliance of the railroad's general credit.

10. Claimants represented MIR as legal counsel for approximately five years prior to MIR's filing its reorganization petition. Claimants believed that MIR's only sources of revenue were freight revenues and subsidy payments from the State of Michigan in lieu of freight revenues. To Claimants' knowledge, MIR did not possess what is generally regarded as "general credit". Claimants relied for payment of their legal fees upon these current operating revenues which, to Claimants' knowledge, were MIR's only source for payment of legal fees.

The trustee notes that this element has been called "illusory." *In re Boston and Maine Corp.*, 634 F.2d at 1379. Specifically, the trustee argues that when these claimants delivered services, they must have been relying upon the railroad's general credit rather than its operating revenues, because in the period before the filing, the railroad took longer and longer to pay its bills generally, and the claimants'

bills in particular. In support, the trustee cites *Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co.,* 176 U.S. 298, 20 S.Ct. 363, 44 L.Ed. 475 (1900); *Dictaphone Sales Corp. v. Powell*, 77 F.2d 795 (4th Cir.1935); and *In re New Hope and Ivyland Railroad Co.*, 353 F.Supp. 608 (E.D.Pa.1973). Again, the trustee's position is not supported by an affidavit.

In *Southern Ry. v. Carnegie Steel Co.*, 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458 (1900), the Supreme Court indicated that in each case, this issue must be determined from a review of all relevant circumstances.

The Court concludes that the claimants have established that they delivered these services with the expectation that their payments would be made from revenues, and that the trustee's position lacks merit. As noted by the claimants, in the relevant pre-petition time period, the railroad had no credit at all upon which the claimants could have relied. The railroad's income consisted of customers' payments and the State's subsidy to cover expenses; however, even with the subsidy, the railroad lost large sums of money. Plainly, the claimants did not expect that their services were being delivered on the basis of the railroad's non-existent credit; rather, they expected to be paid from ongoing receipts.

### IV. *The Diverted Fund or Necessity of Payment Element*

#### A.

In its first statement of the Six Months Rule, the Supreme Court indicated that equity would allow a special priority for claims resulting from necessary pre-receivership expenses, when the railroad had diverted income from its current creditors to its mortgagees in an effort to avoid or delay foreclosure; the court noted that as a matter of practical reality, the mortgagees had impliedly agreed that current creditors

delivered, the only result would have been the earlier filing of the debtor's reorganization petition. *See New York, New Haven,* 278 F.Supp. at 598, n. 10.

The difficulty with this argument is that these services would have been required even if the petition had been filed earlier; in fact, the delivery of such services post-petition would necessarily result in a priority for their payments. Thus is borne the very basis of the rule allowing a priority for these pre-petition expenses in railroad cases. *See: Fosdick,* above; and *Miltenberger,* above.

would be paid before them. *Fosdick v. Schall*, 99 U.S. (9 Otto) 235, 254, 25 L.Ed. 339 (1879).

Similar statements were made in *Burnham v. Bowen*, 111 U.S. 776, 783, 4 S.Ct. 675, 678, 28 L.Ed. 596 (1884); *St. Louis Alton & T.H.R.R. Co. v. Cleveland C., C. & I.R. Co.*, 125 U.S. 658, 673, 8 S.Ct. 1011, 1017, 31 L.Ed. 832 (1888); *Southern Ry. Co. v. Carnegie Steel Co.*, 176 U.S. 257, 285, 20 S.Ct. 347, 358, 44 L.Ed. 458 (1900). *See also: In re New York, New Haven and Hartford Railroad Co.*, 278 F.Supp. 592, 596–98 (1967); *In the Matter of Penn Central Transportation Company*, 458 F.Supp. 1234, 1319–28 (1978).

In *Miltenberger v. Logansport C. & S.W. Ry.*, the Supreme Court allowed a priority for certain pre-receivership expenses, as a matter of equity, simply because the expenses were necessary to maintain the business of the railroad; *Fosdick* was not cited, and there was no indication of any diversion of funds to the mortgagees. This basis for granting a priority to certain prereceivership expenses has been recognized as separate and distinct from the *Fosdick* basis. *See: Union Trust Co. v. Illinois Midland Ry.*, 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963 (1886); *Virginia & Alabama Coal Co. v. Central Railroad & Banking Co.*, 170 U.S. 355, 18 S.Ct. 657, 42 L.Ed. 1068 (1898); and *In re Boston and Maine Corp.*, above.

### B.

The trustee contends that *Miltenberger* describes a "Necessity of Payment" rule, pursuant to which the claimant must establish that both incurring the debt, *and paying it*, are necessary to maintain the business of the railroad. Because these claimants cannot now establish that *payment* of these debts, six years after they were incurred, is necessary to maintain the railroad, the trustee contends that *Miltenberger* provides no basis for the relief sought by the claimants. The trustee further contends that *Boston and Maine*, upon which the claimants rely, confuses the Six Months Rule and the Necessity of Payment Rule. The trustee notes that *Southern Ry. Co. v.*

*Flournoy*, 301 F.2d 847 (4th Cir.1962), similarly confused the two distinct concepts, and as a result was criticized in *New York, New Haven*, 278 F.Supp. at 602, n. 15. *See also: Penn Central*, 458 F.Supp. at 1327. Finally, the trustee notes that *Boston and Maine* is contrary to *Gregg v. Metropolitan Trust Co.*, above.

### C.

This Court concludes that it is difficult, if not impossible, to identify from the prior decisions any unified principle or group of principles to be applied when a claimant requests priority for a pre-petition claim in a railroad reorganization pursuant to 11 U.S.C. § 1171(b). *See: In re Third Avenue Transit Corporation*, 138 F.Supp. 623 (S.D.N.Y.1955), *aff'd*, 230 F.2d 425 (2d Cir. 1956); and *Johnson Fare Box Company v. Doyle*, above. *See also: Collier on Bankruptcy*, ¶ 1171.02 at 1171–2 (15th ed. 1987). Plainly, each case has been decided based upon its unique facts and based upon the court's analysis of the equities asserted by each of the competing parties.

■ Upon that premise, the Court rejects the trustee's argument that the claimants must show either a diversion of funds pursuant to the Six Months Rule, or the necessity to pay the claims pursuant to the Necessity of Payment Rule. Those two "rules" are not really rules at all, but rather classes of circumstances in which the courts have invoked their equity powers to grant priority to certain claims. The Court cannot conclude that these two "rules" describe the only circumstances in which equity will grant a priority to a pre-petition claim in a railroad reorganization.

### D.

In the circumstances of this case, the Court concludes that equity does require that these claims be given a priority such that they will be treated like Chapter 11 administrative expenses, for several reasons:

First, the services resulting in the claims were necessary to maintain the railroad's business; great harm would have come to

the railroad, its creditors and its shareholders if the services had not been delivered.

Second, the delivery of those services in the pre-petition time period was at least as important to the ultimate success of the reorganization effort as the similar post-petition legal services; there is no equitable basis upon which to create any distinction in the priority treatment accorded to the legal services delivered before and after the petition was filed.

Third, timely payments of these claims would not have been voidable preferences. *See:* 11 U.S.C. § 547(c)(2) and (4).

Fourth, to the extent that the debtor did make timely and complete pre-petition payments to other creditors who supplied necessary labor or supplies, such as employees or suppliers, equity requires that the present claims be accorded similar treatment; there is no basis upon which these claimants should be prejudiced simply because the debtor chose to pay certain creditors but not them.

Fifth, the parties' agreement, as far as the Court can determine, was that the claimants would be paid on a current basis; the parties did not intend that the claimants' services would be delivered on a credit basis.

### E.

This result appears to be consistent with the understanding of Congress in enacting 11 U.S.C. § 1171(b). The House Report on the Bankruptcy Reform Act of 1978 indicates, "As under current law, the courts will determine the precise contours of the priority recognized by this subsection." H.R.Rep. No. 95–595, 95th Cong. 1st Sess. at 424 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6380. The Senate Report indicates that the priority traditionally accorded by section 77(b) (Section 77(b) of the Bankruptcy Act of 1898, 11 U.S.C. § 77(b), *repealed*) is a priority for "claims by rail creditors for necessary services rendered during the 6 months preceding the filing of the petition in bankruptcy."

This legislative history indicates that Congress was not aware of any require-ment that a pre-receivership claimant seeking priority must establish either a diverted fund or necessity of payment.

### F.

Finally, it must be noted that the result reached herein is not inconsistent with *Gregg v. Metropolitan Trust Co.*, above, relied upon by the trustee. Therein, the Supreme Court denied priority to a claim for the railroad's pre-receivership purchase of railroad ties. The court simply held that as a matter of equity there was no indication of any necessity in incurring this expense. 197 U.S. at 186 and 190, 25 S.Ct. at 416 and 417. Significantly, the court noted that the priority claim at issue was not as strong as the employees' priority claims, because there was no doubt about the necessity of incurring those expenses. 197 U.S. at 187 and 189, 25 S.Ct. at 416 and 417. *See: In re Boston and Maine*, 634 F.2d at 1377–80.

Here, for the reasons stated above, the Court concludes that analysis of the parties' competing positions does require that equity grant priority to these claims.

Accordingly, the claims of Frasco, Hackett & Mills and Patrick E. Hackett are sustained and the trustee's objections to those claims are overruled.